## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

Emergency Fuel, LLC, et al.      :

     :

      v.                  :        Civil Action No. CCB-00-156

     :

Pennzoil-Quaker State Co.       :

     :

     :

## **MEMORANDUM**

Now pending before this court are motions by the plaintiffs, Emergency Fuel, LLC, Spare

Tank, LLC, William Hubbard, Reginald Spencer, and Leonard Bloom, and the defendant, Pennzoil-

Quaker State Co. ("Pennzoil"), for summary judgment on all counts of the complaint in this patent case.

The plaintiffs filed suit alleging that Pennzoil's "Rescue" product infringes four patents held by the

plaintiffs covering an emergency fuel for motor vehicles called "Spare Tank."  On March 7, 2002, this

court invalidated all four patents and granted summary judgment for the defendant.  *Emergency Fuel,*

*LLC v. Pennzoil-Quaker State Co.*, 187 F. Supp. 2d 575 (D. Md. 2002).  The court's rationale was

that two of the patents were invalid due to lack of enablement, while the other two violated the on-sale

bar.  *Id.* at 578.  On July 25, 2003, the Court of Appeals for the Federal Circuit affirmed the

invalidation of the two patents on the enablement theory, but reversed the ruling with respect to the

other two.  *Emergency Fuel, LLC v. Pennzoil-Quaker State Co.*, No. 02-1391, 2003 WL

21772131 (Fed. Cir. July 25, 2003) (unpublished disposition).  The court will now consider three

motions that its earlier ruling did not reach:  (1) the defendant's motion for summary judgment of

invalidity over prior art (Docket No. 66, 68); (2) the defendant's motion for summary judgment of

unenforceability by reason of inequitable conduct (Docket No. 66, 71);[1] and (3) the plaintiffs' renewed

motion for summary judgment of literal infringement (Docket No. 74).[2]  The parties have fully briefed

the motions and oral argument was held on January 18, 2002, prior to the court's earlier ruling.[3]  For

the reasons that follow, the court will deny all three motions.

## I.

The patents at issue in this case cover, in general terms, an emergency fuel that may be safely

stored in a vehicle over an extended period and used to operate the vehicle's internal combustion

engine in the event the vehicle runs out of fuel.  The two patents that remain in force are U.S. Patent

No. 6,110,237 (issued Aug. 29, 2000) (" '237") and U.S. Patent No. 6,113,660 (issued Sept. 5,

2000) (" '660").[4]  Both resulted from "continuation-in-part" applications based on the two patents that

---

[1] The defendant filed a single motion for summary judgment supported by multiple memoranda outlining its separate theories.  The plaintiffs filed separate oppositions.  Unless otherwise indicated, references to exhibit numbers in the following discussion correspond to the exhibits attached to the memoranda relating to the particular argument under consideration.  The references regarding the plaintiffs' motion for summary judgment generally refer to the papers associated with the initial motion, not the motion to renew.

[2] The plaintiffs filed an earlier motion for summary judgment (Docket No. 28) that I denied without prejudice on May 7, 2001 (Docket No. 53).

[3] A hearing also was held on May 4, 2001 regarding the initial motion for summary judgment by the plaintiffs.

[4] Copies of these patents are included at several points in the record.  The '237 patent is attached, for instance, as Exhibit 2 to the Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment of Infringement (Docket No. 28), while the '660 patent is available as Exhibit 1 to the same memorandum.  For simplicity's sake, I will cite to the patents directly in the following discussion, not to the exhibits.

have been invalidated and a third application that the plaintiffs abandoned.[5]  *See Emergency Fuel*, 187

F. Supp. 2d at 577.  Hubbard and Spencer invented the emergency fuel and applied for the patents

with the help of Bloom, who was their attorney.  Hubbard, Spencer, and Bloom later joined with Spare

Tank, LLC, and Emergency Fuel, LLC, to produce the fuel for sale to the public.

The '237 and '660 patents include thirteen claims each.  The plaintiffs allege that Rescue

infringes all these claims.  One of the most basic claims from the '660 patent reads as follows:

What is claimed is:

1.  An emergency fuel for an internal combustion engine to be safely stored in a vehicle
and to be used when the vehicle is out of fuel, the emergency fuel comprising:

mineral spirits,

the emergency fuel having an octane number of 86 to an octane number of
premium grade gasoline and a flash point of at least 100° F.

Several claims use the phrase "consisting essentially of" in place of "comprising" (claims 6, 7, 8, 9, 10,

12), and one claim refers to "fuel for an internal combustion engine" rather than "emergency fuel" (claim

2).  The octane requirements also vary slightly from claim to claim.[6]  In addition, some claims describe

fuels that contain no butanes or pentanes (claims 2, 7, 13), have a paraffin fraction having nine to twelve

---

[5] I outlined the chronology of the plaintiffs' patent applications in greater detail in my earlier
opinion.

[6] Many of the claims indicate an "octane number of 86 to an octane number of premium grade
gasoline" (claims 1, 2, 3, 6, 7, and 8).  Four claims require an "octane number of about 86 to about 88"
(claims 4, 5, 9, 10), two specify an "octane number in the range of regular to premium grade gasoline"
(claims 10 and 11), and one indicates simply that the octane must be such as to "allow[] the engine to
run smoothly" (claim 13).  The octane number is a measure of a fuel's resistance to "knocking"—that
is, premature detonation—in an internal combustion engine.  *See* 6 *The New Encyclopaedia
Britannica* 916 (15th ed., 1991).

carbon atoms and an aromatic fraction having nine to twelve carbon atoms (claims 3, 5, 8, 10, 13), or are capable of being stored in an automobile for a year or more (claims 2, 7, 13).

The thirteen claims of the '237 patent cover a similar variety of fuels, but whereas the claims in the '660 patent cover only the fuel itself, the claims in the '237 patent identify a "method of using a stable emergency fuel in an internal combustion engine." All thirteen claims in the '237 patent also specify that the fuel is "capable of being safely stored for at least 12 months in a disposable container in the vehicle" and that introducing the fuel into the fuel tank in "an emergency situation" provides for the "clean and smooth operation of the internal combustion engine."[7]

## II.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and

---

[7] For example, the first claim in the '237 patent identifies:

A method of using a stable emergency fuel in an internal combustion engine of a vehicle, the method comprising the steps of:

> providing a quantity of the emergency fuel capable of being safely stored for at least 12 months in a disposable container in the vehicle and being poured by a user into a fuel tank of the vehicle in the event that the vehicle runs out of fuel,

the emergency fuel comprising mineral spirits,

the emergency fuel having an octane number of 86 to an octane number of premium grade gasoline and a flash point of at least 100E F., and

introducing the fuel in an emergency situation into the fuel tank providing a clean and smooth operation of the internal combustion engine.

4

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"A motion for summary judgment must be supported with a sufficient showing to establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1571 (Fed. Cir. 1991). "Once the moving party has established its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002). "In determining whether there is a genuine issue of material fact, the evidence must be viewed in the light most favorable to the opponent of the motion, and doubts resolved in favor of the opponent," *Scripps Clinic*, 927 F.2d at 1571 (internal citations omitted), but the court also must be mindful that "one principal purpose of summary judgment 'is to isolate and dispose of factually unsupported claims or defenses.'" *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1537 (Fed. Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)); *see also Oney v. Ratliff*, 182 F.3d 893, 895 (Fed. Cir. 1999).

## III.

Before the merits of the motions may be addressed, several  preliminary questions regarding the

5

meaning of the patents require resolution.  In particular, the court must determine the meaning of the

term "mineral spirits"—a key limitation in all the plaintiffs' claims, and a subject of heated controversy

between the parties.

According to Pennzoil, "mineral spirits" are a class of chemicals contained in crude oil and

separable from it by means of distillation in a refinery.  The term may not, on this theory, encompass

substances such as "synthetic petrochemicals" that are produced by chemical reactions following

distillation.  In addition, according to Pennzoil, a substance with high aromatic content—that is, more

than 22% or, at most, 32% aromatics—cannot comprise mineral spirits within the meaning of the

patent.[8]  The plaintiffs, naturally, disagree on both counts.  Though they do not propose a specific

definition for the term and have not cited a dictionary or treatise providing one, they argue that

Pennzoil's view of mineral spirits relies on an antiquated usage that their patents reject.  "In earlier

times," they assert, "mineral spirits were obtained by distillation alone.  Now, most mineral spirits,

which are originally obtained by distillation, are subsequently subjected to chemical reactions while still

maintaining their identity as mineral spirits."  (Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. for Summ. J. of

Infringement at 3.)  They also deny that the term is limited to compositions with such low levels of

aromatics.  Both Pennzoil and the plaintiffs have presented expert declarations, depositions, and other

materials in support of their views.

As will be explained below, these issues are relevant to the parties' motions, first, because

---

[8] "Aromatic" compounds are unsaturated hydrocarbon molecules with a closed, ring-like
structure that generally occur in relatively small quantities in crude oils.  19 *The New Encyclopaedia
Britannica* 573 (15th ed., 1991).

Pennzoil argues that a definition of "mineral spirits" as broad as the plaintiffs' would bring the patent claims into conflict with prior patents and thus render them invalid, and second, because Pennzoil has responded to the plaintiffs' motion for summary judgment by asserting that its product, Rescue, is composed of synthetic petrochemicals with 30% aromatic content and therefore cannot infringe the claims of the '237 and '660 patents.

Matters of claim construction are questions of law, not fact. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1455-56 (Fed. Cir. 1998) (en banc); *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996). The court must resolve them by reference, first and foremost, to the disclosures in the patent itself and the patent's prosecution history. *Frank's Casing Crew & Rental Tools, Inc. v. PMR Techs., Ltd.*, 292 F.3d 1363, 1374 (Fed. Cir. 2002). To quote the "well-established axiom in patent law," "a patentee is free to be his or her own lexicographer," assigning whatever meaning he or she likes to the terms in the claims. *Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1563 (Fed. Cir. 1990); *see also E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1369 (Fed. Cir. 2003). Absent, however, clear indications that the patent employs terms in an idiosyncratic fashion, "words in a claim will be given their ordinary and accustomed meaning." *Frank's Casing*, 292 F.3d at 1374. If ambiguity remains after consideration of the "intrinsic evidence"—the patent claims, the specifications, and the prosecution history—the court may consider "extrinsic evidence" regarding the "meaning or scope of technical terms in the claims." *Id.* The court is not limited to evidence presented by the parties, but may consult general reference sources on its own. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 & n.6 (Fed. Cir. 1996).

Unfortunately, the intrinsic materials in this case do not define "mineral spirits" explicitly, and the

implicit usage is not without ambiguities.  Pennzoil emphasizes that an earlier application, incorporated

by reference in the '237 and '660 patents, listed three examples that fit what it calls the "classical

definition" of mineral spirits, that is, the view that mineral spirits are limited to "normal distillation

products."  (Def.'s Opp'n to Pl.'s Mot. for Summ. J. at 16.)  Yet the '237 and '660 patents also list as

mineral spirits several chemicals—Shell 146HT, 200HT, and 340HT ('237 patent, col. 12; '660 patent

col. 12)—that are products of hydrotreatment, a catalytic reaction in which hydrogen atoms are added

to unsaturated hydrocarbon compounds.  *See Petroleum Products Handbook* 148-49 (Virgil B.

Guthrie ed., 1960), Def.'s Mem. in Supp. of Its Mot. for Summ. J. of Invalidity Over Prior Art, Ex. 4

(describing Shell 146HT, 200HT, and 340HT as "hydrotreated solvents" and defining

"hydrotreatment"); *Exxon Petroleum Encyclopedia*, *at* http://www.prod.exxon.com/exxon_

productdata/lube_encyclopedia/ (defining "hydrogen treating").  Another compound identified as a

mineral spirit, Cyclosol 100, is produced by extensive "catalytic reforming."  (Graboski Decl. ¶ 29,

Def.'s Opp'n to Pl.'s Mot. for Summ. J., Ex. A.)  In addition, a passage discussing octane

requirements implies that the categories of "mineral spirits" and "petroleum distillates" are overlapping

but not coterminous:

> A great many petroleum distillates such as certain mineral spirits or Stoddard solvents
> meet both requirements.  The presence of naphthenes, aromatics, and isoparaffins all
> help to improve the octane number.  Normal or straight chain paraffins decrease the
> octane number but these are not predominant except in "straight run" mineral spirits
> from crude oil that has never been cracked.  Most mineral spirits are not in this
> category.

('237 patent, col. 6; '660 patent, col. 6.)  "Straight run" chemicals are direct products of petroleum

distillation, and "cracking" is the process of breaking large hydrocarbon molecules into smaller, more

useful ones.  *See generally* 21 *The Encyclopedia Americana, International Edition* 829-30 (1984). The patent's implication, therefore, is that "most mineral spirits" have been subjected, at a minimum, to cracking and are not direct products of distillation.

Other passages discuss the relationship between "mineral spirits" and "petrochemicals."  At one point, the patents teach, "A great many different refined mineral spirits, petroleum distillates and petrochemicals as well as oxygenated solvents and chemicals can be used if they fall within the desired flash point parameters and meet the other requirements."  ('237 patent, col. 3; '660 patent, col. 4.) Several sentences later, after listing "typical" mineral spirits and oxygenated solvents, the patents explain:

> Many other solvents, chemicals and synthetic petrochemicals can be used if they meet all of the fuel requirements.  Some of these include alkyl benzenes and alkylates obtained by reacting an isoparaffin with an olefinic paraffin.  Also included would be oxygenated fuels such as methyl teriary butyl ether, tertiary amyl methyl ether as well as higher analogs and by products of these materials.

('237 patent, col. 5; '660 patent, col. 6.)  These passages clearly draw some distinction between "mineral spirits" and a broader category of "solvents, chemicals and synthetic petrochemicals" that have similar properties yet do not fit the description of mineral spirits.  "While the claims are to be interpreted in light of the specification, all that appears in the specification is not necessarily within the scope of the claims and thus entitled to protection."  *Novo Nordisk of N. Am., Inc. v. Genentech, Inc.*, 77 F.3d 1364, 1369 (Fed. Cir. 1996).  At a minimum, it is apparent that the listed chemicals—alkyl benzenes, alkylates obtained by reacting an isoparaffin with an olefinic paraffin, and so forth—are examples of substances that could serve the invention's purposes but are not mineral spirits and consequently are not within the scope of the claims.  What exactly it is, however, that sets mineral spirits apart is not

entirely clear. Pennzoil reads the patents to mean that "mineral spirits" and "synthetic petrochemicals" are mutually exclusive categories. The plaintiffs contend that these passages merely define mineral spirits as a subset of the category of "solvents, chemicals, and synthetic petrochemicals"—a subset that could include compounds fitting any of those three descriptions.

The court's view is that Pennzoil's interpretation is closer to the truth. While the patents clearly allow for some chemical modifications such as hydrotreatment, the implication of their usage is that the term "mineral spirits" refers to chemicals that closely resemble mineral spirits in the classical sense. Two features of the text in particular support this conclusion. First, the earlier sentence referring to "refined mineral spirits, petroleum distillates and petrochemicals" appears to place mineral spirits in an intermediate position, in terms of the degree of chemical alteration, between distillates and petrochemicals. If "refined mineral spirits" did not fill a gap in the sequence, there would be no need to mention them: listing distillates and petrochemicals alone would cover the field. Second, in suggesting that "many" chemicals may meet the requirements of the invention yet not be mineral spirits, the patents imply that the category is defined by some feature other than a chemical's physical properties (boiling point, flash point, and so forth). The most obvious candidate is resemblance to the chemical makeup of naturally occurring mineral spirits. By this account, mineral spirits could be produced by means of chemical reactions such as cracking rather than pure distillation, as the patents allow, and hydrotreatment would not necessarily change a mineral spirit into something else, but more substantial chemical changes—changes producing compounds that do not readily occur in crude oil—would yield "petrochemicals," rather than "mineral spirits."

The extrinsic evidence largely confirms this reading of the patents. At times, Pennzoil's expert

suggests that no chemical alteration is allowed.  In his declaration, for instance, he cites a definition from

the *Exxon Petroleum Encyclopedia* and concludes that mineral spirits are "products produced by

distillation"—distillation being a process that "physically separates the molecules but does not

chemically alter them."  (Graboski Decl. ¶ 54, Def.'s Opp'n to Pl.'s Mot. for Summ. J., Ex. A.)  He

goes on, however, to observe that mineral spirits "can contain material that has previously been

'cracked' or reduced in size, and it is possible that one of ordinary skill in this art would also consider a

mineral spirit treated to remove traces of sulfur, olefins and aromatics to still be a mineral spirit." (*Id.* ¶

59.)  The expert's bottom line seems to be that the category of mineral spirits may, as the patents

suggest, include chemicals that have been produced by cracking or subjected to slight modifications

such as hydrotreatment,[9] but may not encompass "synthetic petrochemicals" that "have a very different

composition compared to crude distillation fractions boiling in the same range."  (*Id.* ¶ 22.)  On the

present record, that view is persuasive to the court.

Indeed, much of the plaintiffs' evidence supports the same conclusion.  One of their exhibits, a

Shell Chemical Co. chart of proprietary "Hydrocarbon Solvents," identifies two of the hydrotreated

compounds listed in the patents, 146HT and 200HT, as "mineral spirits."  (Pl.'s Reply to Def.'s Opp'n

to Pl.'s Mot. for Summ. J., Ex. 6)  Significantly, however, it describes Cyclosol 100 as an "aromatic

solvent" instead.  (*Id.*)  The implication is that, notwithstanding the plaintiffs' characterization of

Cyclosol 100 as a mineral spirit in its patents, the industry usage would not include that

---

[9] Pennzoil's expert appears to accept that Shell's hydrotreated solvents 146HT and 200HT,
two of the three listed in the '237 and '660 patents, are mineral spirits.  (*See* Graboski Decl. ¶¶ 28, 39,
Def.'s Opp'n to Pl.'s Mot. for Summ. J., Ex. A.)

chemical—which Pennzoil's expert asserts is highly synthetic—within the category.  Similarly, in his

deposition, the plaintiffs' expert claimed it is "unlikely" that mineral spirits are made "these days" by

distillation,[10] but he could point to no authority for his view that synthetic chemicals may fit the definition.

(Bechtold Dep. at 68-71, Def.'s Opp'n to Pl.'s Mot. for Summ. J., Ex. A3.)  Mr. Hubbard, too,

contends in his declaration that "most mineral spirits, which are originally obtained by distillation, are

subsequently subjected to chemical reactions while still maintaining their identify [*sic*] as mineral spirits,"

yet he mentions hydrotreatment as an example of such chemical reactions and does not address

examples of more extensive chemical sythesis.  (Hubbard Decl. in Supp. of Pl.'s Reply to Def.'s Opp'n

to Pl.'s Mot. for Summ. J. ¶ 2.)  If anything, these materials reinforce, rather than contradict, the court's

conclusion that "mineral spirits" must resemble naturally occurring distillation products to fall within the

coverage of the '237 and '660 patents.

The second issue, that of the aromatic content allowed in mineral spirits, is more

straightforward.  During the prosecution of the patents, the patent examiner called a Japanese patent to

the plaintiffs' attention.  Mr. Hubbard distinguished it by noting that the Japanese invention "discloses

high concentrations (60-32%) of aromatics such as benzene, toluene and xylene."  (Def.'s Opp'n to

Pl.'s Mot. for Summ. J. of Infringement, Ex. B at PZEF 2513.)  "This product," he went on, "would

produce an undesirable dark exhaust due to the high aromatic content."  (*Id.*)  "The prosecution history

limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during

prosecution."  *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).

---

[10] Pennzoil's expert contends that mineral spirits are in fact generally produced by distillation. (Graboski Decl. ¶ 12, Def.'s Opp'n to Pl.'s Mot. for Summ. J., Ex. A.)

Accordingly, the plaintiffs are estopped from asserting that their patent covers fuels with 32% or greater aromatic content.[11]

Nevertheless, the patents do not appear to envision a lower threshold, such as 22%, which Pennzoil's expert contends is the industry standard (Graboski Decl. ¶ 39, Def.'s Opp'n to Pl.'s Mot. for Summ. J., Ex. A).[12] To be sure, the patents stress that "[t]he emergency fuel must also have a content of aromatic components low enough to prevent the production of soot and smoky combustion products so as to be clean," ('237 patent, col. 6; '660 patent, col. 7), and one of the earlier applications indicated that the aromatic content should be "less than 15% by volume,"[13] (U.S. Patent No. 5,681,358, col. 6 (issued Oct. 28, 1997), Pl.'s Mem. in Supp. of Their Mot. for Summ. J. of Infringement, Ex. 4). The '237 and '660 patents also teach, however, that "mineral spirits with higher

---

[11] The plaintiffs argue that "Mr. Hubbard's criticism was not of aromatics *per se*, but of the low molecular weight aromatics (benzene, toluene and xylene having six, seven and eight carbon atoms each) present in the composition disclosed in the reference." (Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. for Summ. J. of Infringement at 11.) This interpretation is implausible in light of the declaration's later reference to "an undesirable dark exhaust due to the high aromatic content." If Mr. Hubbard meant that only a "high concentrations of aromatics with low molecular weight" produce undesirable dark exhaust, he should have said so. As it stands, the best reading of the statement is that Mr. Hubbard meant to refer to aromatics in general and listed the three compounds merely to indicate what specific components of the Japanese invention were aromatic.

[12] The expert appears to base the 22% limit on the American Society for Testing and Materials D-235 Standard Specification for Mineral Spirits, which he includes as an exhibit to his report. (*See Annual Book of ASTM Standards 2000*, Ex. 6 to Graboski Report, Def.'s Opp'n to Pl.'s Mot. for Summ. J., Ex. A2.)

[13] The other invalidated patent set the maximum figure at 50%. (*See* U.S. Patent No. 5,938,799, col. 6 (issued Aug. 17, 1999), Pl.'s Mem. in Supp. of Their Mot. for Summ. J. of Infringement, Ex. 3.)

aromatic content" must be included to elevate the octane level ('237 patent, col. 6; '660 patent, col. 6),

and one of the examples suggests that aromatics must comprise as much as 60% of the fuel by volume

to attain the octane rating of 86 that most of the claims require ('237 patent, col. 12; '660 patent, col.

13). Indeed, in affirming the earlier patents' lack of enablement, the Federal Circuit stressed that 15%

aromatics was insufficient to achieve the claimed octane levels and noted that the later patents

suggested higher numbers. *Emergency Fuel*, No. 02-1391, slip op. at 11. Because it would conflict

with that reasoning to hold that the later patents require an aromatic fraction close to 20%, I conclude

instead that the patents' generic requirement of a "low enough" aromatic content does not entail any

specific percentage limitation apart from the 32% limit implied by the prosecution history.

Finally, Pennzoil also suggests that the '237 and '660 patents cannot claim any fuel that includes

a component that is "a 100% aromatic product." (Def.'s Opp'n to Pl.'s Mot. for Summ. J. at 22.)

Such a fuel, Pennzoil argues, would not "comprise mineral spirits" or "consist essentially of mineral

spirits" because one of its ingredients would not be a mineral spirit. I reject this construction of the

patents. As even Pennzoil admits, it is possible for mineral spirits to include substantial aromatic

content—as much as 22% according to Pennzoil, as much as 32% by my reading. It makes no sense

to suggest, as Pennzoil's analysis does, that the label for two chemically identical fuels could differ

based on whether the fuel was extracted from crude oil or formed by mixing pure compounds. If the

distilled fuel is a mineral spirit, the mixture of its constituents must be also. Accordingly, the reference

point for the plaintiffs' patent claims is the fuel as a whole, not the components that are mixed to

produce it. While the patents might not cover fuels including aromatic compounds that differ

substantially from those that occur in distilled naphtha, the mere fact that one of the constituents of a

14

blended product is 100% aromatic does not take it outside the claims.

## IV.

Having discussed these basic questions about the scope of the patents, I will now turn to the first of the defendant's motions, the motion for summary judgment of invalidity over prior art. The '237 and '660 patents are invalid if the inventions they describe were either "anticipated" by some reference in the prior art or "obvious" based on the understanding of an ordinarily skilled artisan at the time of the invention. *See* 35 U.S.C. §§ 102(a)-(b), 103(a). Pennzoil argues that a 1943 patent for aviation "safety fuel," U.S. Patent No. 2,321,280 (issued June 8, 1943) to Brown (the "Brown patent"),[14] anticipated the plaintiffs' invention, and that in any event the invention was obvious based on Brown and other available sources. I will address each of these arguments in turn.

## A.

"To anticipate a claim, a prior art reference must disclose every limitation of the claimed invention, either explicitly or inherently." *In re Schreiber*, 128 F.3d 1473, 1477 (Fed. Cir. 1997). According to the single source rule, all the claim's limitations must be contained in a single reference, *see, e.g.*, *Brown v. 3M*, 265 F.3d 1349, 1351 (Fed. Cir. 2001), and the reference "must describe the patented subject matter with sufficient clarity and detail to establish that the subject matter existed in the prior art and that such existence would be recognized by persons of ordinary skill in the field of the invention," *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002).

---

[14] A copy of this patent is attached as Exhibit 1 to Defendant Pennzoil-Quaker State's Memorandum in Support of Its Motion for Summary Judgment of Invalidity Over Prior Art (Docket No. 68).

Anticipation, unlike claim construction, is a question of fact, and it requires proof by clear and convincing evidence. *Hazani v. U.S. Int'l Trade Comm'n*, 126 F.3d 1473, 1477 (Fed. Cir. 1997). "For summary judgment to be proper, there must be no genuine dispute whether the limitations of the claimed invention are disclosed, either explicitly or inherently, by an allegedly anticipating prior art reference." *Id.*

At first blush, the suggestion that Brown's 60-year-old patent for aviation fuel anticipates the plaintiffs' invention appears rather implausible.[15] The contexts of the two inventions could hardly be more different. The plaintiffs' invention is an emergency fuel for use in motor vehicles that have run out of gas. Brown's is a "safety fuel" for use in aircraft. As the plaintiffs observe in their brief, the notion of introducing fuel from a disposable container into the tank of a stalled airplane is preposterous.[16]

---

[15] I noted my skepticism about this argument in a footnote to my earlier ruling. *See Emergency Fuel*, 187 F. Supp. 2d at 583 n.6.

[16] Based on the following jovial exchange during the oral hearing, it does not appear that Pennzoil disputes this point:

> MR. FREED: . . . Go to the prior art motion, Your Honor.
>
> THE COURT: Mr. Brown and the airplane fuel.
>
> MR. FREED: Mr. Brown, yes. By the way, Your Honor, one of my colleagues, Mr. Saunders, tells me he can prove to you that airplanes run out of gas despite what they say over there. But I told him we're not going to get involved in that in this courtroom.
>
> THE COURT: Can you walk out on the wing and pour in some emergency stuff out of a plastic container?
>
> MR. FREED: I'm not going to try it. . . .

(Tr. of Hr'g on Jan. 18, 2002, Docket No. 102, at 84.)

16

Furthermore, the crux of the plaintiffs' invention is a gasoline substitute that neither proves dangerously explosive nor loses its utility when stored for extended periods in a confined space such as an automobile trunk.  It is not evident why aviation fuel, which is normally consumed during flight just after fueling, would need to satisfy those twin constraints.  At any rate, Pennzoil has not disclosed any such reason to the court.

The test of anticipation, however, does not require that the prior art have envisioned the use discovered by the inventor.  "It is well settled that the recitation of a new intended use for an old product does not make a claim to that old product patentable."  *Schreiber*, 128 F.3d at 1477.  All the doctrine requires is that "the prior art necessarily functions in accordance with, or includes, the claimed limitations."  *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999).  "Probabilities and possibilities" are not enough.  *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999).  It must be clear that "the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill."  *Cont'l Can Co. USA, Inc. v. Monsanto, Inc.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991).

Several recent cases may illustrate what it means for a limitation to be "necessarily present."  In *Titanium Metals Corp. of America v. Banner*, 778 F.2d 775 (Fed. Cir. 1985), a leading case in this area, the Federal Circuit reviewed a patent claiming the invention of a titanium alloy "characterized by good corrosion resistance in hot brine environments."  *Id.* at 776.  Though no prior reference disclosed the alloy's resistance to corrosion, the court upheld the PTO's denial of the application because a previous Russian patent disclosed an identical composition.  "Congress," the panel explained, "has not seen fit to permit the patenting of an old alloy, known to others through a printed publication, by one

17

who has discovered its corrosion resistance or other useful properties." *Id.* at 782.  In a second case,

*In re Schreiber*, 128 F.3d 1473 (Fed. Cir. 1997), the Federal Circuit likewise invalidated a patent

where the structure it disclosed, a conical fitting for dispensing popcorn several kernels at a time, had

been previously patented as a spout for oil canisters.  Given that the structures were identical, the

difference in the contexts of the two inventions was deemed immaterial.  *Id.* at 1478.

By contrast, in *Crown Operations International, Ltd. v. Solutia Inc.*, 289 F.3d 1367 (Fed.

Cir. 2002), the court upheld a denial of summary judgment where two patents for "safety glass"

described similar structures but the earlier patent did not "disclose or discuss a two percent limitation

for the reflectance contribution of the solar control film," as the later patent did.  *Id.* at 1377.  The court

explained:

> Crown urges us to accept the proposition that if a prior art reference discloses the same
> structure as claimed by a patent, the resulting property, in this case, two percent solar
> control film reflectance, should be assumed.  We decline to adopt this approach
> because this proposition is not in accordance with our cases on inherency.  If the two
> percent reflectance limitation is inherently disclosed by the [earlier] patent, it must be
> necessarily present and a person of ordinary skill in the art would recognize its
> presence. . . .  The mere fact that a certain thing may result from a given set of
> circumstances is not sufficient.

*Id.* (internal citations and quotation marks omitted).  Because the prior reference did not indicate the

limitation, whereas the later patent taught that it was essential to prevent visual distortions, the first

patent did not anticipate the second.  It did not matter that some subset of glass structures satisfying the

parameters of the earlier patent would also fit the new patent's claims; the invention was still novel.[17]

---

[17] Though the *Schreiber* opinion did not use this language, one way to understand the case's
result is in terms of a "species"/"genus" distinction.  A prior reference indicating a species within a genus
bars later patenting of the genus.  *See, e.g.*, *Brown v. 3M*, 265 F.3d 1349, 1351 (Fed. Cir. 2001).

Finally, in *MEHL/Biophile International Corp. v. Milgraum*, 192 F.3d 1362 (Fed. Cir. 1999), the

Federal Circuit reaffirmed that new methods of use for old devices may be patentable.  The patent at

issue claimed a method of hair depilation involving the alignment of a laser light applicator "substantially

vertically over a hair follicle opening."[18]  *Id.* at 1364.  The defendants argued that the laser's manual,

which described a technique for removing tattoos, anticipated the patent.  Although the court went on

to conclude that an academic article had anticipated the patent, it rejected the argument based on the

manual, reasoning that an operator "could use the laser according to the manual without necessarily

aligning the laser 'substantially vertically over a hair follicle opening.'  The possibility of such an

alignment does not legally suffice to show anticipation." *Id.* at 1365.

     In light of these precedents, it is impossible to conclude that the Brown patent satisfies the test

of anticipation with respect to the plaintiffs' patent claims.  To begin with, the "mineral spirits" limitation

of the plaintiffs' claims is not inherent in Brown.  As I explained above, the patents' usage of the term

does not encompass synthetic compounds and it specifically excludes "alkylates obtained by reacting an

isoparaffin with an olefinic paraffin."  All of the fuels claimed in the Brown patent are formed by such

reactions.  Most are derived by reacting isobutane, which is an isoparaffin,[19] with a "$C_4$ olefin," which is

-------------------------

On the other hand, prior patenting of the genus does not preclude species claims where the limitations
defining the narrower patent reflect a significant innovation.  *See, e.g.*, *Utter v. Hiraga*, 845 F.2d 993,
998 (Fed. Cir. 1988).

    [18] The patent explained that the germ cells in a hair follicle could be destroyed without damaging
surrounding tissue by illuminating the cells with laser light at a particular frequency.  *Id.*

    [19] An "isoparaffin" is a "branched isomer of a straight-chain paraffin molecule."  *Exxon
Petroleum Encyclopedia*, *supra*.

obviously olefinic.[20]  Others stem from reactions of isopentane, another isoparaffin, or isopentane and isobutane in combination, with such olefins as isobutylene, a butene, or a mono-olefin.  This is simply not a case like *Titanium Metals* or *Schreiber* where the invention in the later patent necessarily meets the limitations of the earlier one.  To the contrary, the requirements of these two patents are incompatible.[21]

Even if the fuels did meet the "mineral spirits" limitation, at least some of the plaintiffs' claims would remain valid.  A number of them describe fuels with a paraffin fraction having nine to twelve carbon atoms per molecule and an aromatic fraction meeting that same criterion.  Pennzoil's expert argues that the Brown patent anticipates these claims because its specification section describes a method of controlling the alkylation reaction to produce "mainly trimer"; he explains that trimer in this case would mean paraffinic molecules with twelve carbon atoms.  (Graboski Decl. ¶ 32, Def.'s Ex. 2.) The expert also notes that some of the claimed reactions—namely, those involving isopentane and a four-carbon olefin—would produce paraffin molecules with nine to ten carbon atoms.  (*Id.* ¶ 31.)  As for the aromatic fraction, he observes that the specification mentions using alkylated aromatics as blending agents, and, according to the expert, "[t]welve of the thirteen aromatic hydrocarbons [Brown] suggests have 9-12 carbon atoms per molecule."  (*Id.* ¶ 32.)  Even assuming the expert is correct on all

_____

[20] An "olefin" is "any of a series of unsaturated, relatively unstable hydrocarbons characterized by the presence of a double bond between two carbon atoms in its structure, which is commonly straight-chain or branched."  *Id.*

[21] Though this conclusion leads me to reject Pennzoil's motion, it is not, in fact, inconsistent with Pennzoil's position.  Pennzoil concedes that interpreting the term "mineral spirits" restrictively, as the court has done, eliminates the conflict with Brown.  In fact, it points to that consequence as one reason to adopt its construction of the patents.

these points, this showing does not satisfy the standard for anticipation by inherency. Apart from the

isopentane reaction, which appears to produce molecules satisfying the nine to twelve carbon

isoparaffin requirement, the disclosures identified by the expert are teachings, not limitations. Nothing in

the patent claims requires the inclusion of an aromatic fraction with nine to twelve carbon atoms per

molecule; indeed, the claims describing fuels derived from the isopentane reaction that would meet the

isoparaffin requirement do not provide for the inclusion of aromatics at all, much less aromatics having

the claimed molecular weight. As with the two percent safety glass in *Crown Operations*, it is possible

that a product satisfying the limitations of the earlier patent would also satisfy the limitations of the

challenged claims—but it is only possible, and "probabilities and possibilities" do not establish

inherency.

The same may be said of the claims describing fuels that are "capable of being safely stored in

an automobile for a year or more." There is some disagreement as to what this limitation means:

Pennzoil suggests the point is to require good "gum stability" (Def.'s Mem. in Supp. at 7 & n.8),

whereas the plaintiffs interpret it to require an absence of butanes and pentanes (which may be

explosive) and an olefin content of "substantially zero" (because olefins can cause gumming) (Pl.'s

Opp'n at 7, 10). In any event, Pennzoil's only evidence for the gum stability of the fuels is a statement

to that effect in the specification and a low bromine number (indicating low olefin content) in the

patents' examples. The examples, however, do no more than establish possibility or probability,

whereas Pennzoil's burden is to show that fuels produced according to Brown's claims will necessarily

have the properties claimed in the patents. *Cf. Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1303

(Fed. Cir. 1997) ("While examples disclosed in the preferred embodiment may aid in the proper

interpretation of a claim term, the scope of the claim is not necessarily limited by such examples.").

Likewise, while it may be true that Brown's fuels contain "no butanes or pentanes," as some of the plaintiffs' claims require, Pennzoil's only evidence on this point is an assertion by Pennzoil's expert that one of the examples in the patent's specification contains no such compounds. Again, this is not clear and convincing proof that some fuel claimed by Brown will necessarily meet the limitations of the plaintiffs' patent claims.

Finally, Brown in no way anticipates the method claims of the '237 patent. Pennzoil's only argument on this score is that adding fuel to the tank of an automobile that has run out of gas is a natural way to use the fuel. That argument, however, goes not to anticipation, but to obviousness, which the court will address below. As concerns anticipation, it is certainly true that merely identifying the substance as an "emergency fuel," as the '660 patent does, would not make the invention novel if Brown had previously identified the underlying fuel; *Schreiber*, the popcorn dispenser case, proves as much. Yet even if the underlying fuels were identical—which they are not—the fact would remain that the Brown patent does not include any limitation, either expressly or inherently, that corresponds to the '237 patent's claimed steps of storing the fuel safely in the vehicle for over a year and introducing it into the tank of an automobile that is out of fuel. *Cf. Canton Bio-Medical, Inc. v. Integrated Liner Techs., Inc.*, 216 F.3d 1367, 1370 (Fed. Cir. 2000) ("Infringement of process inventions is subject to the 'all-elements rule' whereby each of the claimed steps of a patented process must be performed in an infringing process, literally or by an equivalent of that step, with due attention to the role of each step in the context of the patented invention."). The appropriate analogy is therefore *MEHL/Biophile*, not *Schreiber*: new methods may be patentable even if they employ old tools. *See Catalina Marketing*

*Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 809 (Fed. Cir. 2002) (noting that "apparatus claims [do not] necessarily prevent a subsequent inventor from obtaining a patent on a new method of using the apparatus where that new method is useful and nonobvious"); *Schreiber*, 128 F.3d at 1481 (Newman, J., dissenting) ("The new use can of course be claimed as a method of use.").

The plaintiffs also argue that the requirement of "clean and smooth" engine operation in some of its claims is not inherent in the Brown fuels, and that the lead susceptibility of those fuels sets the Brown patent apart. I am more skeptical about these distinctions,[22] but I see no reason to consider them. The differences I have already discussed make clear that Pennzoil has failed to establish by clear and convincing evidence that each and every limitation of the claims in the '237 and '660 patents is explicit or inherent in a single prior art reference. The court, therefore, will not grant summary judgment based on Pennzoil's theory of anticipation.

## B.

Though not anticipated by any particular reference in the prior art, an invention may still be unpatentable if it is "obvious" to those skilled in the art based on the general state of knowledge in the field. "Obviousness is a legal conclusion based on factual determinations." *Aktiebolaget Karlstads Mekaniska Werkstad v. U.S. Int'l Trade Comm'n*, 705 F.2d 1565, 1575 (Fed. Cir. 1983). It requires consideration of four factors: (1) the scope and content of the prior art; (2) the level of

---

[22] It appears quite likely, though I express no opinion on the matter, that the Brown fuels would permit "clean and smooth" operation of an automobile engine assuming they do the same in the internal combustion engine of an aircraft, and the fact that regulations now prohibit the use of lead to raise the octane rating of automotive gasoline does not appear to create a relevant distinction between Spare Tank and the Brown fuels.

ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) any

objective indicia of non-obviousness. *Crown Operations*, 289 F.3d at 1375 (citing *Graham v. John*

*Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)). A finding of obviousness may not be based

on "the hindsight combination of components selectively culled from the prior art to fit the parameters of

the patented invention." *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 546 (Fed. Cir. 1998). Rather,

"[t]here must be a teaching or suggestion within the prior art, within the nature of the problem to be

solved, or within the general knowledge of a person of ordinary skill in the field of the invention, to look

to particular sources, to select particular elements, and to combine them as combined by the inventor."

*Crown Operations*, 289 F.3d at 1376. To permit summary judgment, obviousness must be

established "by clear and convincing evidence based on undisputed facts." *Quad Envtl. Techs. Corp.*

*v. Union Sanitary Dist.*, 946 F.2d 870, 872 (Fed. Cir. 1991).

Judging by the evidence in the record to date, the four-factor obviousness test appears to weigh

against Pennzoil's position. The only evidence Pennzoil has presented on the first two factors, the

scope and content of the prior art and the level of ordinary skill in the art, is the Brown patent. In fact,

Pennzoil's argument, in its own words, is that "Brown anticipates or renders obvious Plaintiffs' asserted

patent claims."[23] (Def.'s Mem. in Supp. at 8.) If the Brown patent is in fact the best indication of the

prior art, then my earlier discussion of anticipation should suffice to show that the first two factors, as

well as the third, weigh in favor of the plaintiffs. If the suggestion is instead that practitioners of the art

---

[23] Though the Federal Circuit has admonished district courts to apply the four *Graham* factors
explicitly, *see Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 990 (Fed. Cir. 1988), Pennzoil
never gives any indication of how it would have the court apply the test. In fact, it never states the test
at all.

would have understood that mineral spirits could be used interchangeably with the components of the Brown fuel, then Pennzoil must present evidence to that effect. Instead, as has already been discussed, much of Pennzoil's evidence goes to show that Spare Tank's mineral spirits and the Brown fuel's alkylates are, in fact, distinct.[24] Pennzoil argues that an emergency fuel, also called Rescue, that it marketed earlier ("old Rescue") would have given skilled artisans an incentive to experiment with other emergency fuels, but since old Rescue was predominantly aromatic (*see* Def.'s Opp'n to Pl.'s Mot. for Summ. J. at 22 & Ex. B at PZEF 2462-63), and therefore not comprised of mineral spirits, the product's presence on the market would not necessarily have led inventors to attempt the compositions identified in the '237 and '660 patents.

In any event, the last of the four factors, the objective indicia of non-obviousness, appears decisive. Pennzoil's own actions are impossible to square with its contention that the plaintiffs' invention was obvious. Pennzoil struggled for years to develop an emergency fuel. Its first attempt, old Rescue, appears to have been a commercial failure (*see* Hubbard Decl., Def.'s Opp'n to Pl.'s Mot. for Summ. J., Ex. B at PZEF 2461-62), while its second, the Rescue product at issue here, required at least some research and development (*see* Fang Presentation, Pl.'s Mem. in Supp. of Their Mot. for Summ. J. of Infringement, Ex. 9 (describing development of Rescue); Pennzoil Laboratory Notebook, Pl.'s Mem. in Supp. of Their Mot. for Summ. J. of Infringement, Ex. 10 (recording experiments in development of Rescue)). Pennzoil's vice president of research and development has touted the

---

[24] Pennzoil, of course, recognizes this tension in its arguments. Its position is that the plaintiffs' patent claims would be obvious if they were broad enough to cover Rescue. Its obviousness argument might, therefore, have had greater force if the court had adopted a broader construction of the patents.

product as the answer to a "desperate consumer need." (Hillary Durgin, *Houston, We Have a*

*Product*, Financial Times, Dec. 14, 1999, at 17, Pl.'s Ex. 1.) The court can see no reason why a

satisfactory emergency fuel did not emerge sooner—nor, indeed, why Pennzoil failed to market one—if

the necessary teachings were evident in the Brown patent and other decades-old sources. *Cf.*

*Graham*, 383 U.S. at 17-18 (listing "long felt but unsolved needs" and "failure of others" as

considerations bearing on obviousness). Even if Pennzoil is right that the fuel's composition is

unsurprising, the fact that the elements of the invention "lay about in the prior art available for years to

all skilled workers . . . is itself evidence of nonobviousness." *Panduit Corp. v. Dennison Mfg. Co.*,

810 F.2d 1561, 1577 (Fed. Cir. 1987).

      This conclusion is especially true of the method claims. Though, as I noted earlier, merely

identifying a substance as "emergency fuel" would not be enough to distinguish it from identical

compositions in the prior art, new methods of using the old invention could still be non-obvious, just as

the innovative laser techniques were in *MEHL/Biophile*. *See Mentor H/S, Inc. v. Med. Device*

*Alliance, Inc.*, 244 F.3d 1365, 1377 (Fed. Cir. 2001) (upholding a jury's conclusion that a liposuction

method involving the use of an ultrasound device to melt tissue was not rendered obvious by prior

references that mentioned liposuction as a possible application of the device but stressed the

importance of preventing excessive heating); *Catalina Marketing*, 289 F.3d at 809-810 (describing a

hypothetical method of using shoe polish to "grow[] hair when rubbed on bare human skin" as an

innovation that would be patentable despite a prior patent covering the composition of the shoe polish);

*In re King*, 801 F.2d 1324, 1327 (Fed. Cir. 1986) (noting that "the discovery of a new use for an old

structure based on unknown properties of the structure" could be "patentable to the discoverer as a

process"). Pennzoil quotes the patent examiner's comment that "[i]f one had any type of fuel . . . and ran out of gas they [*sic*] would put it in their tank to try to get to a service station." (Def.'s Mem. in Supp. at 7 n.9.) Yet while it may be true that a driver would place any available fuel in the tank (I am rather more skeptical on that point than Pennzoil and the patent examiner), the crux of the plaintiffs' invention was to recognize that fuels of a particular composition, stored in a particular way, may be used reliably to power a motor vehicle when it has run out of fuel. Again, Pennzoil's own failure to recognize this application of the fuel undermines its argument that this method of using the fuel is obvious.

In short, Pennzoil has not met its burden of proving by clear and convincing evidence that the plaintiffs' invention was obvious.[25] Because this theory also fails, the defendant's motion for summary judgment of invalidity over prior art will be denied.

## V.

Pennzoil also seeks summary judgment on the grounds that the inventors of the plaintiffs' emergency fuel committed "inequitable conduct." This defense requires Pennzoil to prove, in effect, that the plaintiffs' patents were obtained by means of a fraud against the PTO. *See Burlington Indus., Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988). As the Federal Circuit has put it, "[i]nequitable conduct resides in failure to disclose material information, or submission of false material information, with an intent to deceive, and those two elements, materiality and intent, must be proven by

---

[25] Since Pennzoil, not the plaintiffs, has the burden of proving obviousness or anticipation, its suggestion that summary judgment is warranted because the plaintiffs have responded only with "arguments," not "evidence," is beside the point. (Def.'s Reply at 2, 3, 8.)

clear and convincing evidence." *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867,

872 (Fed. Cir. 1988).  To establish the defense, the defendants must first make a threshold showing on

both prongs, materiality and intent.  *Perseptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225

F.3d 1315, 1319 (Fed. Cir. 2000).  Once that showing is made, "the intent necessary to establish

inequitable conduct is based on a sliding scale related to materiality of the omission."  *Abbott Labs. v.

Torpharm, Inc.*, 300 F.3d 1367, 1380 (Fed. Cir. 2002).  That is, the more material the

misinformation, the less need there is to prove intent, and vice versa.  Whether inequitable conduct

occurred is a question of fact, *Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d 1435, 1439

(Fed. Cir. 1991), but "[t]he defense of inequitable conduct is entirely equitable in nature, and thus not

an issue for a jury to decide."  *Perseptive Biosystems*, 225 F.3d at 1318.

     Pennzoil argues that the plaintiffs' conduct was inequitable in multiple respects.  First, Pennzoil

alleges that the inventors failed to inform the PTO that none of the examples submitted along with an

earlier application, which became U.S. Patent No. 5,681,358 (issued Oct. 28, 1997) (" '358"),[26] one

of the invalidated patents, achieved the octane level required by the specifications.  The inventors,

according to Pennzoil, had received test results from an outside laboratory indicating that the octane

level fell short, yet they did not provide the results to the PTO.  They also failed to disclose that their

own testing had been largely conducted on a lawnmower engine, not an automobile.  Pennzoil further

alleges that the second of the two invalidated patents, U.S. Patent No. 5,938,799 (issued Aug. 17,

---

[26] A copy of this patent is included in the record, among other places, as Exhibit 4 to the
Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment of Infringement (Docket
No. 28).

1999) (" '799"),[27] also listed examples that failed to attain the octane levels required by the claims. The inventors again knew of the deficiency because of laboratory tests they had ordered, yet they did not disclose it to the PTO.

Next, Pennzoil claims that the inventors deceived the PTO about the level of commercial interest in their emergency fuel while they were pursuing the '358 application. Because Mr. Bloom believed that commercial success could be an influential factor with the PTO, the inventors submitted letters from third parties indicating interest in the invention. The inventors, according to Pennzoil, did not reveal that they had written the letters themselves while merely soliciting signatures from the third parties, nor that other parties had been contacted but refused to provide letters expressing interest. Further, what interest they did generate was obtained by circulating a letter, ostensibly from the laboratory, that apparently misrepresented the results of the octane tests. Pennzoil claims the letter resulted from a deliberate alteration by the inventors; the plaintiffs say it was an innocent mistake. The inventors also submitted the results of a telephone survey to the PTO, but failed to reveal that the market research firm that conducted it was owned and operated by Mr. Hubbard.

With respect to the '237 and '660 patents, Pennzoil argues that these patents are tainted not only because of their incorporation by reference of the '358 and '799 applications, but also because the inventors failed to reveal to the PTO that the fuels claimed in the patents had been offered for sale more than one year prior to the filing date of the applications. Because inventions that have been on

---

[27] A copy of this patent is included in the record, among other places, as Exhibit 3 to the Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment of Infringement (Docket No. 28).

sale or in public use for more than a year may not be patented, 35 U.S.C. § 102(b), patent applicants

must disclose such prior sales to the PTO.  *See Brasseler, U.S.A. I, LP v. Stryker Sales Corp.*, 267

F.3d 1370, 1381-83 (Fed. Cir. 2001).

While Pennzoil's allegations are certainly worrisome, they do not rise to the level that would

justify summary judgment in its favor.  To begin with, most of the alleged misdeeds relate to the earlier

applications, not the patents at issue here.  Though misrepresentations that "permeate[] the prosecution

of the other patents-in-suit" may invalidate later applications, *Consol. Aluminum Corp. v. Foseco*

*Int'l Ltd.*, 910 F.2d 804, 812 (Fed. Cir. 1990), it is doubtful in this case that any of the

misrepresentations were such that "there is a substantial likelihood that a reasonable patent examiner

would consider [them] important in deciding whether to allow the application to issue," as the Federal

Circuit's materiality standard requires, *Hoffmann-La Roche, Inc. v. Promega Corp.*, 323 F.3d 1354,

1367 (Fed. Cir. 2003).  Assuming that examples in the '237 and '660 patents did obtain the requisite

octane numbers—and Pennzoil does not argue otherwise—it is not substantially likely that a reasonable

patent examiner would have granted or denied the patents based on the octane numbers obtained in

earlier samples.  *Cf. Abbott Labs.*, 300 F.3d at 1380 (concluding that "failure to disclose a single

(apparently) aberrant result" from experimental testing was not highly material).  Likewise, even if the

letters expressing commercial interest were predicated on misinformation about the octane levels, that

fact would be of limited relevance to the later applications, considering that the inventors had attained

the stated octane levels by that time.  As for the alleged "ghost writing" of the letters, this fact is simply

not relevant at all:  as I noted during oral argument, signing a letter is still an indication of interest.  (Tr.

of Hr'g on Jan. 18, 2002, Docket No. 102, at 72.)  Nor is it material that some parties refused to sign:

the signed letters still reflect some degree of interest, and the examiner would likely have assumed that

other parties were contacted apart from those that submitted letters.  Finally, the ownership of the

research firm is not particularly material because a phone survey conducted by one of the inventors

could still indicate commercial interest, even if the indication were weaker than in the case of research

by an outside firm.

Pennzoil's only independent argument for invalidation of the '237 and '660 patents is its claim

that the inventors should have disclosed the prior offers of sale.  Though this argument might have been

plausible based on this court's earlier ruling, the Federal Circuit's reversal strips it of force.  According

to the Federal Circuit, Pennzoil "has not established by clear and convincing evidence that the

emergency fuel that was offered for sale or publicly used had an octane rating of at least 86" and was

covered by the patent claims.  *Emergency Fuel*, No. 02-1391, slip op. at 18.  If the prior offers of

sale did not involve the same product, then they could not have triggered the on-sale bar, and they

could not have been material to the applications.  Pennzoil cannot, therefore, argue that these non-

disclosures amounted to inequitable conduct.

None of the preceding analysis is meant to excuse the inventors' conduct.  Applicants owe the

PTO a duty of candor and good faith, 37 C.F.R. § 1.56(a), and if Pennzoil's allegations are true, the

inventors of Spare Tank may well have breached it.  Yet not every breach of duty towards the PTO

amounts to inequitable conduct, *see, e.g.*, *Seiko Epson Corp. v. Nu-Kote Int'l, Inc.*, 190 F.3d 1360,

1365-68 (Fed. Cir. 1999) (failure to present a declaration to foreign inventors in their native language

as required by regulations); *Kingsdown Med.*, 863 F.2d at 873 (careless inclusion of a previously

rejected claim in a revised patent application), and the fact-specific nature of the defense makes it

inappropriate in most cases to grant it in a motion for summary judgment, *see Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1190 (Fed. Cir. 1993) (noting that "our precedent urges caution in the grant of summary judgment respecting a defense of inequitable conduct"); *cf. FMC Corp. v. Manitowoc Co., Inc.*, 835 F.2d 1411, 1415 (Fed. Cir. 1987) (noting that inequitable conduct is not "established upon a mere showing that art or information having some degree of materiality was not disclosed").  In this case, the court doubts that a threshold showing of materiality has been made, but even if it were, the relatively slight materiality of the purported misdeeds would mean that a stringent showing of deceptive intent would be required under the sliding scale analysis, and the court is unprepared to find such intent without hearing testimony from the inventors in person.  *See KangaROOS U.S.A., Inc. v. Caldor, Inc.*, 778 F.2d 1571, 1573-74 (Fed. Cir. 1985) ("A summary judgment of fraud or inequitable conduct, reached while denying to the person accused of the fraud or inequitable conduct the opportunity to be heard on the issue, is a draconian result.").  At the very least, a genuine issue of material fact remains, and summary judgment will therefore be denied.

## VI.

The final motion to consider is the plaintiffs' motion for summary judgment.  The plaintiffs allege that Pennzoil's product, Rescue, infringes all the claims of the '237 and '660 patents.  More specifically, they argue that Rescue is a fuel comprised of mineral spirits, with an octane rating of above 86 and a flash point above 100E F, that may be safely stored in an automobile trunk for over a year and used when a motor vehicle is out of fuel.  Whereas the construction of the patent claims was a matter of law, whether Rescue infringes the patents is a question of fact.  *Biovail Corp. Int'l v. Andrx Pharms., Inc.*, 239 F.3d 1297, 1300 (Fed. Cir. 2001).  To prevail on their complaint at trial, the plaintiffs will

need to establish by a preponderance of the evidence that Rescue fits each and every element of at least one claim in the '237 and '660 patents. *See Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1333 (Fed. Cir. 2001) (all-elements rule); *Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226, 1238 (Fed. Cir. 1989) (burden of proof).

The undisputed facts in the record to date do not establish that the plaintiffs will carry their burden. The fatal defect in their argument is that the record does not make plain that Rescue comprises mineral spirits within the meaning of the '237 and '660 patents.[28] As both parties acknowledge, Rescue is a mixture of two ingredients: ISOPAR L, an isoparaffinic solvent produced by Exxon-Mobil Chemical that makes up roughly 70% of the fuel, and Aromatic 150, another Exxon-Mobil product that constitutes the remainder. Neither component by itself appears to be a mineral spirit; consequently, the mixture of the two is not one either.

According to Exxon-Mobil's marketing materials, which Pennzoil has placed in the record, ISOPAR L is "a carefully fractionated isoparaffinic solvent of exceptional purity." (Def. Ex. 6.) It is "[s]ynthesized from selected petroleum fractions" and "composed largely of saturated paraffins of highly branched molecular structures." (*Id.*) "Unlike conventional petroleum solvents, ISOPAR solvents are catalytically synthesized from selected petroleum stocks to yield a product with a very high isoparaffinic

---

[28] This conclusion comports with my earlier dismissal without prejudice of the plaintiffs' initial motion (Docket No. 53). At that time, I explained that I was not persuaded "that the broad claim construction proffered by plaintiffs, under which the term 'mineral spirits' as used in the claims encompasses a blend of synthetic petrochemicals (Aromatic 150 and ISOPAR L) contained in the defendants' allegedly infringing product, is correct as a matter of law." I reserved final judgment, however, until after I considered Pennzoil's arguments regarding the invalidity or unenforceability of the patents. The plaintiffs later renewed their motion. (Docket No. 74.)

content—approaching 100% in some grades [including ISOPAR L]." (*Id.*)  The implication is that

ISOPAR L is a synthetic chemical:  it is formed from extensive catalytic reactions and it is designed to

have properties that do not occur in "conventional petroleum solvents," a category that presumably

includes distilled mineral spirits.  In fact, Pennzoil's expert contends that ISOPAR L is an alkylate

derived from a reaction between an isoparaffin and an olefinic paraffin—just the chemical makeup that,

as I noted in construing the patents and distinguishing Brown, is specifically excluded from the category

of "mineral spirits."  While the plaintiffs' expert purports not to know how ISOPAR L is made, he

noted in his deposition testimony that it could be produced from an alkylating reaction between an

isoparaffin and an olefinic paraffin, and he conceded that it would be considered "synthetic" if that term

were defined to refer to "something that's made because it's not naturally occurring."  (Bechtold Dep.,

Def. Ex. A3 at 116-17.)  The only reasonable interpretation of this evidence is that ISOPAR L is a

synthetic petrochemical and therefore not a mineral spirit according to the usage in the '237 and '660

patents.

       As for Aromatic 150, Pennzoil's expert asserts—again, without rebuttal by the plaintiffs—that it

is "also a synthetic petrochemical.  It is created by catalytic hydrotreating and reforming followed by

distillation and solvent extraction."  (Graboski Decl. ¶ 61, Def. Ex. A.)  Thus, this component, too,

would appear to be a manufactured substance that differs substantially from the constituents of naturally

occurring mineral spirits.  In any event, where some 70% of a fuel is a substance that is not a mineral

spirit and does not occur as a major component of mineral spirits, it is impossible to conclude that the

fuel "comprises" or "consists essentially of" mineral spirits.  That the remaining 30% also may not be a

mineral spirit or a component of mineral spirits merely adds weight to this conclusion.[29]

In sum, the present record does not permit the court to conclude that Rescue comprises mineral spirits, much less that there is no material issue of fact as to whether it does.  The plaintiffs make much of the fact that a health advisory on Rescue's packaging warns that the fuel "contains petroleum distillate [*sic*]," contradicting, it would seem, Pennzoil's argument that Rescue's components are "synthetic."  (Pl.'s Mem. in Supp. of Pl.'s Mot. to Renew, Ex. C.)  Yet the wording of a label—least of all a warning label targeted at lay consumers—is not a reason to disregard the extensive evidence Pennzoil has presented regarding the chemical makeup of Rescue.  Because the fact-finder will be required to examine the chemical composition of the accused product, and because the weight of the evidence in the record suggests that Rescue is not composed of "mineral spirits," it is impossible to conclude as a matter of law that Rescue infringes any of the twenty-six patent claims at issue.

## VII.

Based on the current record and the interpretation of the '237 and '660 patents I have suggested above, the plaintiffs' patents do not appear invalid, but neither does the defendant's product appear to infringe them.  While it is possible that further factual development would permit the parties to prevail on the theories they have presented here, at present there is at least a material issue of fact with respect to all three motions for summary judgment.  Accordingly, all the motions will be denied.

A separate order follows.

---

[29] Pennzoil also argues that Rescue cannot be a mineral spirit because Aromatic 150 is nearly 100% aromatic and a fuel including such a chemical cannot "comprise" mineral spirits.  As I noted earlier, this argument is unpersuasive because a mixture of chemicals could resemble mineral spirits even if none of its ingredients standing alone would do so.

__December 11, 2003__                                          ___/s/_____
Date                                                          Catherine C. Blake
                                                              United States District Judge